# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

|  |  |  |
|---|---|---|
| (1) ZHN, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-12-1289-M |
| | ) | |
| (1) RANDY MILLER, LLC; | ) | |
| (2) RANDY L. MILLER; | ) | |
| (3) LIPPARD AUCTIONEERS, INC.; | ) | |
| (4) TROY LIPPARD; | ) | |
| (5) ANGIE LIPPARD; | ) | |
| (6) BRADY LIPPARD; | ) | |
| (7) JERRY WHITNEY; and | ) | |
| (8) UNITED COUNTRY REAL | ) | |
| ESTATE, INC., d/b/a UNITED | ) | |
| COUNTRY AUCTION SERVICES | ) | |
| AND UNITED COUNTRY | ) | |
| REAL ESTATE  SERVICES, | ) | |
| | ) | |
| Defendants. | ) | |

## ZHN, LLC'S RESPONSE IN OPPOSITION TO THE MILLER DEFENDANTS MOTION FOR SUMMARY JUDGMENT

Murray E. Abowitz, OBA No. 00117
George W. Dahnke, OBA No. 2131
Abowitz, Timberlake & Dahnke, P.C.
105 North Hudson, Tenth Floor
Post Office Box 1937
Oklahoma City, Oklahoma 73102
Telephone:   (405) 236-4645
Facsimile:    (405) 239-2843
Email:  mea@abowitzlaw.com
gwd@abowitzlaw.com
mainmail@abowitzlaw.com

**Attorneys for Plaintiff, ZHN, LLC**

# Table of Contents

Table of Authorities .............................................................................................. iv-vii

Introduction ....................................................................................................... 1-5

Response of the Plaintiff to Defendants' Statement of Undisputed Material Facts......... 5-8

Additional Facts that Preclude Summary Judgment in Favor of the
    Miller Defendants.......................................................................................... 8-21

Argument and Authorities ...................................................................................... 21-45

    I.       Summary Judgment Standard Defendants ................................... 21-22

    II.     While Oklahoma Law will apply in this case, because Oklahoma
          Case Law on "absolute" auctions is not well developed, this Court
          should consider U.S. Supreme Court cases, law review articles, and
          cases dealing with auctions from other jurisdictions ................... 22-23

    III.    Oklahoma's Uniform Commercial Code Section that provides a
          remedy for the victim of auction fraud at an auction of goods, 12A
          O.S. § 2-328, should be applied by analogy in this case Defendants
          ......................................................................................... 23-27

    IV.    Plaintiff has neither rescinded the real estate purchase contract nor
          elected a remedy ....................................................................... 27-36

    V.     Randy Miller, individually, is liable to Plaintiff because he engaged
          in the tortious acts complained of.............................................. 36-37

    VI.    Randy Miller, individually, and Randy Miller, LLC are liable for the
          acts of their agent Lippard ....................................................... 37-40

    VII.   Miller is not insulated from liability by the business judgment
          rule ......................................................................................... 40-42

    VII.   The veil of Randy Miller LLC may be pierced because Miller used
          the entity to commit fraud.......................................................... 42-43

IX.  Miller is liable for bad faith breach of contract because both Miller and Lippard fraudulently, knowingly and intentionally breached Lippard's admitted duty to deal fairly and honestly with Plaintiff and the public ................................................................................ 43-44

X.  Plaintiff has tendered sufficient evidence creating triable issues of fact for each of its claims ........................................................... 44-45

Relief Requested ................................................................................. 45

Certificate of Service ......................................................................... 46

## Exhibits

Exhibit No. 1:  Agreement between Millard and Lippard Auctioneers, LLC.
Exhibit No. 2:  Deposition of Troy Lippard
Exhibit No. 3:  Deposition of Alex Magid
Exhibit No. 4:  Auction Brochure
Exhibit No. 5:  Mineral Deed
Exhibit No. 6:  Deposition of Randy Miller
Exhibit No. 7:  Deposition of Brady Lippard
Exhibit No. 8:  Articles of Organization of T. Turner Investments, LLC
Exhibit No. 9:  Unexecuted Operating Agreement
Exhibit No. 10:  T. Turner Investments, LLC Notes
Exhibit No. 11:  Bidder List
Exhibit No. 12:  Deposition of J. Jones, and Exhibit 45 to his deposition, NAA
Exhibit No. 13:  Texas Auction Academy, #00143
Exhibit No. 14:  Deposition of Jerry Whitney
Exhibit No. 15:  Deposition of Carol Haygood
Exhibit No. 16:  Clerking Change Log
Exhibit No. 17:  Deposition of Angie Lippard
Exhibit No. 18:  Contract, 05-03-2012
Exhibit No. 19:  Contract, 05-04-2012
Exhibit No. 20:  Supplemental Agreement
Exhibit No. 21:  Letter from Tack to Miller and Lippard, 07-10-2012
Exhibit No. 22:  Letter from Lippard to Tack, 07-11-2012
Exhibit No. 23:  Letter from Tack to Miller and Lippard, 07-13-2014
Exhibit No. 24:  Letter from Tack to Miller and Lippard, 08-02-2012
Exhibit No. 25:  Letter from Hodgden to Novotny, 08-14-2012
Exhibit No. 26:  Letter from Tack to Hodgden and Lippard, 09-12-2012
Exhibit No. 27:  E-mails from Hodgden, 09-26-2012
Exhibit No. 28:  E-mail from Lippard, 11-20-2012

Exhibit No. 29:  Letter from Hodgden to Abowitz and proposed Release of Earnest Money, 11-21-2012
Exhibit No. 30:  Release of Earnest Money with Reservation of Rights
Exhibit No. 31:  E-mails with Bolz, 01-07-2013
Exhibit No. 32:  E-mail from Bolz, 01-18-2014
Exhibit No. 33:  Consigner Sheet
Exhibit No. 34:  Warranty Deeds
Exhibit No. 35:  E-mails, 07-09-2012
Exhibit No. 36:  Pages from archive Lippard Website
Exhibit No. 37:  Partial Transcript of Audio Tape of Mineral Announcement
Exhibit No. 38:  Deposition of Ronald Miller
Exhibit No. 39:  Deposition of Lori Sheen
Exhibit No. 40:  Deposition of Edward Sheen
Exhibit No. 41:  Deposition of Derik Matthew
Exhibit No. 42:  Notes from Auction by Carol Haygood and Lori Sheen
Exhibit No. 43:  Bidding Card
Exhibit No. 44:  Evidence Preservation Notice
Exhibit No. 45:  Deposition of Christina Wright (Proxibid)
Exhibit No. 46:  Letter to Christina Wright, 06-26-2014
Exhibit No. 47:  E-mail from Christina Wright, 08-03-2014
Exhibit No. 48:  Notes of Carol Haygood
Exhibit No. 49:  Proxibid Report
Exhibit No. 50:  Check from Welch
Exhibit No. 51:  Deposition of Gary Dye
Exhibit No. 52:  E-mail, 05-08-2012
Exhibit No. 53:  Notes regarding tracts offered to Alexander Magid
Exhibit No. 54:  E-mail from Angie Lippard, 09-12-2012
Exhibit No. 55:  Letter from Troy Lippard to Mike Brown, 09-24-2013
Exhibit No. 56:  Clerking Change Log
Exhibit No. 57:  E-mail from Tidmore, 12-09-2014
Exhibit No. 58:  Answers to Randy Miller's First Interrogatories
Exhibit No. 59:  Supplement of ZHN to Interrogatory No. 12
Exhibit No. 60:  Notes of Carol Haygood
Exhibit No. 61:  Bank Records of Randy Miller

# Table of Authorities

## United States Circuit Court of Appeals Cases

19 Solid Waste Dep't Mechanics v. City of Albuquerque,
156 F.3d 1068, 1071-72 (10th Cir. 1998) ....................................................................... 22

Allen v. Minnstar, Inc., 8 F.3d 1470, 1476 (10th Cir. 1993) ............................................ 21

Amen v. Black, 234 F.2d 12, 20 (10th Cir.1956) .............................................................. 39

Appliance Distributors, Inc. v. Mercury Electric Corp.,
202 F.2d 651, 654 (10th Cir.1953) ............................................................................... 31

Champagne Metals v. Ken-Mac Metals, Inc., 458 F.3d 1073 (10th Cir. 2006) ............... 45

Continental Bank v. Burke, 5 F.3d 545 (Table), 1993 WL 360664 (10th Cir. 1993) ....... 45

Eresch v. Braecklein, 133 F.2d 12 (10th Cir. 1943) ......................................................... 30

Federal Deposit Insurance Corp. v. Palermo,
815 F.2d 1329, 1339 (10th Cir.1987) ....................................................................... 30-31

Financial Industrial Fund, Inc. v. McDonnell Douglas Corp.,
474 F.2d 514, 518 (10th Cir.) ....................................................................................... 41

Frater v. Tigerpack Capital, Ltd. 1999 WL 4892 at *4, (S.D. N.Y. 1999) ...................... 41

King v. Horizon Corp., 701 F.2d 1313, 1318 (10th Cir. 1983) .................................... 39, 40

Okla. Federated Gold & Numismatics, Inc., v. Blodgett,
24 F.3d 136, 141 (10th Cir.1994) ............................................................................ 36-37

Robertson v. Roy L. Morgan Prod. Co., 411 F.2d 1041, 1043 (10th Cir. 1969) ........ 42, 43

Specialty Beverages, LLC v. Pabst Brewing Co.,
537 F.3d 1165, 1179-1184, 1180 (10th Cir. 2008) ........................................... 33, 34, 45

Transpower Constructors, Div. of Harrison Int'l Corp. v. Grand River Dam Authority,
905 F.2d 1413, 1419-1420 (10th Cir. Okla. 1990) ........................................................ 32

## United States Supreme Court

American Soc. of Mech. Eng., Inc. v. Hydrolevel Corp.,
    456 U.S. 556 (1982) ............................................................................38-39

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) ................................ 22

Chevalier v. Sanford, 475 A.2d 1148 (Me. 1984) ............................................................. 27

Cuba v. Hudson & Marshall, Inc.,
    445 S.E.2d 386, 387, n.1 (Ga. Ct. App. 1994) ............................................................. 27

Hoffman v. Horton, 212 Va. 565, 186 S.E.2d 79 (1972) .................................................. 27

Veazie v. Williams, 49 U.S. 134, 152, 162-163 (1850) ............... 22, 23, 25, 26, 35, 36, 38

Precision Instr. Mfg. Co. v. Automotive Maint. Mach. Co.,
    324 US 806, 814-815 (1945) ......................................................................................... 30

## United States District Court Cases

TRC Envtl. Corp. v. Quoddy Bay LNG,
    LLC, 2011 WL 5429178 (W.D. Okla., 2011) .............................................................. 43

## Oklahoma State Court Cases

Appleman v. Pepis, 246 P. 225, 227 (Okla. 1926) ............................................................. 31

Beshara v. Southern Nat'l Bank, 928 P.2d 280, 288 (Okla. 1996) .................................... 44

Boyle Servs., Inc. v. Dewberry Design Group, Inc.,
    24 P.3d 878,880 (Okla. Civ. App. 2001) .................................................................... 45

Brock v. Thompson, 1997 OK 127, n. 58, 948 P.2d 279 (Okla. 1997) ............................. 45

Clark v. Sloan, 37 P.2d 263 (Okla. 1934) ........................................................................ 45

Cleveland Trust Co. v. State ex rel. Hunt, 55 P.2d 594, 596-597 (Okla. 1976) .............. 45

Creach v. Home Owners' Loan Corp.,
    191 Okla. 484, 485, 131 P.2d 108, 110 (1942) ............................................................ 31

Dill v. Rader, 533 P.2d 650 (Okla.App.1975) ................................................ 40

EKE Builders, Inc. v. Quail Bluff Assocs.,
   714 P.2d 604 (Okla.Civ.App.1985) .............................................. 44

Fanning v. Brown, 85 P.3d 841, 846 (Okla.2004) ........................................... 42

Gibson Oil Co. V. Hayes Equip. Mfg. Co., 21 P.2d 17, 19 (Okla. 1933) ...................... 39

Harmon v. Phillips Petroleum Co.,
   196 Okla. 607, 610–11, 167 P.2d 360, 364–65 (1946) ................................ 31

Howell v. James, 818 P.2d 444, 447–48 (Okla.1991) ...................................... 33

Gooldy v. J.B. Klein Iron & Foundry Co., 170 Okl. 466, 40 P.2d 1070 .................. 32, 33

Larkin v. Tallant, 206 P.2d 982, 986 (Okla. 1949) ...................................... 34, 35

Morrow Dev. Corp. v. Am. Bank & Trust Co., 1994 OK 26, ¶8 (Okla. 1994) .............. 32

MTG Guarnieri Mfg., Inc. v. Clouatre,
   2010 OK CIV APP 71, ¶23, 239 P.3d 202, 213) .......................................... 41

Polin v. American Petrofina Co., 589 P.2d 240, 242 (Okla. Ct. App. 1978) .................. 32

Rogers v. Meiser, 68 P.3d 967, 970 n. 5 (Okla.2003) ....................................... 33

Shrier v. Morrison, 357 P.2d 196, 201-202, (Okla, 1960) ................................. 39

Smoot v. B & J Restoration Servs., Inc.,
   279 P.3d 805, 814 (Okla. Civ. App. 2012) ........................................... 36, 37

Roring v. Hoggard, Okl., 326 P.2d 812 (1958) ................................................ 40

## Oklahoma State Statutes

12 O.S. § 235 ................................................................................ 30

12A O.S. § 2-328(4) ..................................................................... 23, 25

15 O.S. § 59 ........................................................................................... 45

15 O.S. § 233 ......................................................................................... 45

15 O.S. § 233B ....................................................................................... 36

15 O.S. § 235 ......................................................................................... 31

15 O.S. §§ 751-763 ................................................................................ 23

15 O.S. §§ 751-764 ................................................................................ 36

15 O.S. §§ 752(2) .............................................................................. 38, 44

15 O.S. § 752 (13)(14) ....................................................................... 38, 45

15 O.S. § 753(8) (11) (20) ....................................................................... 45

18 O.S. § 2016 .................................................................................. 41, 42

21 O.S. § 1506 ................................................................................... 22, 38

**Federal Rules of Civil Procedure**

FED.R.Civ.P. 56(c) ................................................................................ 21

**Other Authorities**

Horse-Tradin': Legal Implications of Livestock Auction Bidding Practices" Arkansas Law Review 37 Ark.L.Rev. at 136, 119, 131-139, 145, 119-216 ......................... 23, 25, 26

Rocky Mt. Min. L. Inst. 17, 17.05(3)(1988) ......................................................... 8

UCC 2-328 ...................................................................................... 25, 26

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) ZHN, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-12-1289-M |
| | ) | |
| (1) RANDY MILLER, LLC; | ) | |
| (2) RANDY L. MILLER; | ) | |
| (3) LIPPARD AUCTIONEERS, INC.; | ) | |
| (4) TROY LIPPARD; | ) | |
| (5) ANGIE LIPPARD; | ) | |
| (6) BRADY LIPPARD; | ) | |
| (7) JERRY WHITNEY; and | ) | |
| (8) UNITED COUNTRY REAL | ) | |
| ESTATE, INC., d/b/a UNITED | ) | |
| COUNTRY AUCTION SERVICES | ) | |
| AND UNITED COUNTRY | ) | |
| REAL ESTATE SERVICES, | ) | |
| | ) | |
| Defendants. | ) | |

## ZHN, LLC'S RESPONSE IN OPPOSITION TO THE MILLER DEFENDANTS'[1] MOTION FOR SUMMARY JUDGMENT

Plaintiff, ZHN, LLC ("ZHN"), submits this Response and Objection to the Miller Defendants' Motion for Summary Judgment [Doc. #135] ("Motion") and requests that the Motion be overruled.

### INTRODUCTORY STATEMENT OF THE CASE

This matter centers upon an "absolute auction" that was anything but absolute. Rather, it was set-up through which all the defendants named here, employing sham

---

[1] As used herein, the term "Miller Defendants" shall refer collectively to Randy L. Miller and Randy Miller, LLC.

bidding and exchange of inexact information, pushed up the price of the land and mineral rights at auction, defrauding good faith bidders.

In January of 2012, Randy L. Miller ("Miller") entered into an agreement with Lippard Auctioneers, Inc. ("Lippard") for the sale of approximately 9,740 acres of land. Though Miller signed the agreement with Lippard in his personal capacity, the land to be auctioned was owned by Randy Miller, LLC ("Miller, LLC.")  That absolute auction was to take place on May 3rd and 4th, 2012 (the "May Absolute Auction").  Advertisements for the May Absolute Auction (released in February of 2012) also noted that the auction would include about 3,580 mineral acres, as part of the some of the surface tracts being auctioned.

Miller, in the deceptive fashion that would ultimately characterize the May Absolute Auction entirely, had already sold a portion of those mineral acres to Dye Oil Company, retaining only a 25% interest above and a 50% interest below the principal Mississippian producing zone and there was no attempt to communicate that Miller and Lippard would not actually be selling what they had advertised until a day or two before the May Absolute Auction, and even then not in a way as to fully inform those prospective mineral bidders, including ZHN.

ZHN is an Oklahoma Limited Liability Corporation formed for the purpose of purchasing farmland in Oklahoma.  Alex Magid ("Mr. Magid"), ZHN's only principal, had prior dealings with Lippard Auctioneers and was thus made aware of the pending May Absolute Auction.  Magid decided to participate in the auction and did so by

telephone; he tracked the auction through Proxibid.  Mr. Magid, on behalf of ZHN, placed his bids through Brady Lippard, a ringman for Lippard Auctioneers.

Unknown to ZHN and Mr. Magid, as well as most of the prospective bidders, Miller himself was also clandestinely bidding on the property for sale – using the name T. Turner Investments.  T. Turner Investments, LLC ("T. Turner) did not have an executed Operating Agreement, did not have a valid Service Agent, did not have a tax identification number, did not have a bank account and had conducted no business. Miller had formed T. Turner a week before the May Absolute Auction for the sole purpose of bidding on the land Miller himself had agreed to sell.

Thus, Miller, the thinly disguised seller of the land, bid on that same land through bidding sheets he provided to Troy Lippard ("T. Lippard").  T. Lippard and his ringman, Jerry Whitney, guided by Miller's instructions as to how much to bid and on which parcels, proceeded on Miller's behalf placing bids for T. Turner on many tracts.  They used three different bidding numbers, in effect adding to the deception by creating an impression that multiple bidders were bidding and inflating the auction price.  T. Lippard was also bidding for a Mr. McClure under a different number, 215.  T. Lippard did not disclose that he was bidding on behalf Miller or McClure.  T. Turner was the successful bidder on at least seventeen (17) tracts and the runner up bidder on at least 27 others. The bidding instruction sheets provided by Miller to T. Lippard were destroyed.

T. Turner's successful bids were treated differently from all other successful bids: neither Real Estate Purchase Contracts nor earnest money was required.  The tracts that were not resold during or shortly after the auction reverted back to Miller or Miller, LLC.

Auction records that might have revealed the actual course of events were altered to reflect that T. Turner had not bid successfully. To the extent the records were not altered, they were destroyed. T. Turner did not close on a single property for which it was the successful bidder.

Following two (2) days of bidding on surface tracts, the minerals were auctioned. On the day of the mineral auction, prior to the bidding, T. Lippard indicated to the bidders that the previously provided information was, "a little bit incorrect". He told the bidders that the information previously provided was "preliminary" and noted that an exact report had since been received. The "exact report" was a mineral deed that reflected the Miller/Dye transaction of December 2011, save for that portion of the deed including the legal description. That "exact report" was placed on a table at the back of the auction room and not made available to Mr. Magid, who was participating in the auction by phone and internet. Brady Lippard advised Mr. Magid he did not know anything about the minerals.

Gary Dye of Dye Oil Company was the successful bidder on every single mineral tract. Dye and the Miller Defendants had substantial dealings in 2011 and 2012, resulting in the hundreds of thousands of dollars in profits for the Miller Defendants, allegedly as finder fees, for persons selling their minerals to Dye Oil Company, who then sold them to a third party. Though earnest money was deposited in support of Dye's bid, Dye ultimately defaulted and the minerals reverted to Miller. Dye was yet another shill bidder.

4

Irregularities continued to occur after the May Absolute Auction. Mr. Magid was offered a number of tracts on which bids had been successfully placed (though the Lippards would not tell him who the successful bidder was). But, ZHN executed Real Estate Purchase Contracts and deposited the required amount of earnest money of $285,950.00. Those Real Estate Purchase Contracts required that the seller furnish evidence of marketable title within a certain period of time. When Miller and Miller LLC were unable to do so, Mr. Magid asked for a refund of the earnest money he had deposited. Miller refused to refund the money. The transactions were never completed. After an unsuccessful contractual mediation, this case was filed.

The Miller Defendants' Motion for Summary Judgment attacks the Plaintiff's case by asserting that Mr. Magid rescinded the original agreement and thus has no further recourse. The Miller Defendants also raise other issues, all of which lack substance. What stands is an overwhelming factual presentation of fraud and deceit, as well as substantial damages, which Plaintiff requests that it be permitted to submit to a fact finder at the currently scheduled trial date.

## RESPONSE OF PLAINTIFF TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

1.     Undisputed.

2.     Disputed.  (AF 4, 5[2])

3.     Disputed.  (AF 5)

4.     Undisputed.

---

[2] AF refers to Additional Facts That Preclude Summary Judgment in favor of the Miller Defendants (infra).

5.     Undisputed.  Although by operation of law, the earnest money could be recovered under various legal theories.

6.     Disputed.  (AF 62-64).

7.     Undisputed.

8.     Disputed.  None of the evidence tendered by Miller shows that ZHN ever demanded "rescission" or indicated it was cancelling or terminating the contracts.  The evidence Miller tenders as Ex. 8 to his Motion shows that Miller rejected Plaintiff's demands. And his evidence marked as Ex. 7 shows that ZHN demanded return of the money with ZHN reserving full rights against Miller.

The evidence Plaintiff has tendered shows that Plaintiff made two demands.  First, on July 10, 2012, it demanded a return of *a portion* of the Day 1 earnest money and Miller, within 24 hours, rejected the demand and announced he would proceed with closing the contracts.  (AF 64-65).  Then on September 12, 2012, Plaintiff made its first demand for return of all of the earnest money, but with full reservation of rights under the contracts.  (AF 69).  Again, Miller rejected this demand, instead insisting that ZHN forfeit the earnest money.  (AF 71).

9.     Disputed.  The evidence Miller tenders as Ex. 8 to his Motion shows that ZHN denied that the money was returned at the request of ZHN.  Ex. 8 also shows that Miller rejected ZHN's demands. Plaintiff's tendered evidence shows that ultimately the parties agreed for the money to be transferred to ZHN with each party reserving all rights against the other.  (AF 77).

10.     Disputed.  The evidence Miller tenders as Ex. 10 to his Motion shows: 1) the parties agreed that ZHN reserved all rights against Miller; and 2) that ZHN had signed a separate document that was attached to the short-form Release of Earnest Money that specifically reserved ZHN's right to pursue all claims against Miller in this litigation. See also (AF 77).  Miller's tendered evidence omits this important piece of evidence that the short-form release was attached.

11.     Disputed.  The evidence Miller tenders as Ex. 11 shows that Miller and ZHN had signed separate releases of earnest money that were attached to the short-form release.  A review of those documents shows they were not identical. (AF 77-78).  And Miller's Ex. 11 also shows that both parties expressly reserved all rights each had against the other.

12.     Undisputed.

13.     Undisputed.

14.     Undisputed.

15.     Undisputed.

16.     Disputed in part, undisputed in part.   Undisputed, the Plaintiff and Defendant had no relationship prior to the auction.  However, the auction created a relationship between T. Lippard, as agent of Miller/Miller, LLC and ZHN through its member, Mr. Magid to treat him with honesty, integrity and fair dealing at all times during the auction.  (AF 26-27).

17.     Undisputed.

7

18.     Undisputed in part and disputed in part.    Undisputed that the contracts ultimately signed were entered in the name of Miller, LLC.  However, it was necessary to reconvey certain tracts, principally tract 6 and tract 12 from Miller/Miller, LLC before the contracts in question were entered into.  (AF 5).

19.     Undisputed.

20.     Undisputed.

21.     Undisputed.

22.     Undisputed.

## ADDITIONAL FACTS THAT PRECLUDE SUMMARY JUDGMENT IN FAVOR OF THE MILLER DEFENDANTS

1.     Miller admitted in his Answer to Plaintiff's Third Amended Complaint that Lippard was Miller's agent at the auction. (Doc. #78, Miller Defendants' Answer to Plaintiff's Third Amended Complaint, ¶ 13).

2.     Miller determined the auction should be an absolute auction and the auction was advertised and conducted as an absolute auction (Ex. 2, Depo. of T. Lippard, pgs. 37, 104; Ex. 4, Brochure).

3.     Miller advertised that 3,580 mineral acres[3] would be sold at the May 3-4, 2012 absolute auction. (Ex. 4, Brochure).

4.     The Defendant Lippard Auctioneers, Inc. conducted an absolute auction on May 3-4, 2012 to sell surface acres and minerals purportedly owned by Miller, LLC.  The sale was pursuant to an agreement between Miller, individually and Lippard Auctioneers,

---

[3] A "mineral acre" is defined as "the full mineral interest in one acre of land." 34 *Rocky Mt. Min. L. Inst.* 17, 17.05(3) (1988).

Inc. (Ex. 1, Agreement between Miller and Lippard Auctioneers, Inc.; Ex. 2, Depo. of T. Lippard, pgs. 36-37)

5.      At the time of the auction, a number of surface tracts were owned by Miller individually, including tracts 6 and 12 on which ZHN was the high bidder and tract 63. (Ex. 33, Consigner Sheet, Ex. 34, Warranty Deeds; and Ex. 35, emails on 07-09-2012).

6.      Randy Miller is the sole member of Miller, LLC.  (Ex. 6, Depo. of Randy Miller, pg. 147).

7.      At least a portion of the proceeds paid to Miller, LLC by Guarantee Abstract were deposited to Miller's personal bank account (Ex. 61, Security National – 96).

8.      Mr. Magid bid by telephone in that auction under bidder number 427.  His telephone contact was ringman, Brady Lippard. (Ex. 3, Depo. of Magid, Pgs. 46, 50; and Ex. 7, Depo. of Brady Lippard, pg. 29).

9.      Mr. Magid was bidding on behalf of ZHN, LLC, an Oklahoma Limited Liability Company of which he was the only member.  (Ex. 3, Depo. of Magid, pg. 22-23).

10.      Mr. Magid is a resident of Utah. (Ex. 3, Depo. of Magid pg. 6).

11.      Mr. Magid had been a successful bidder on three properties on behalf of ZHN, LLC in a prior Lippard Auction and closed on those transactions after a title problem involving a railroad right-of-way.  At the time Mr. Magid was a resident of Las Vegas, Nevada. (Ex. 3, Depo. of Magid, pgs. 6, 40-42; and Ex. 2, Depo. of T. Lippard, pg. 289).

12.     The property to be auctioned in the May Absolute Auction was the subject of a brochure, several versions of which were distributed to the public. The brochures set out descriptions of the property to be sold and well as the type of the auction and the conditions associated with it. (Ex. 2, Depo. of T. Lippard, pg. 287, Ex. 3, Depo. of Magid, pg. 66; and Ex. 4, Brochure).

13.     The auction was first advertised in February of 2012. (Ex. 3, Depo. of Magid, pg. 58; and Ex. 36, pages from archive Lippard website).

14.     At the time the auction was first advertised, the minerals were described as 3,580 plus or minus mineral acres and 9,700 plus or minus surface acres. (Ex. 4, Brochure)

15.     The surface acres were to be auctioned on day 1 and day 2 of the auction, to be followed by the mineral auction. (Ex. 2, Depo. of T. Lippard, pg. 68).

16.     In December of 2011, Miller, LLC, sold those mineral acres to Dye Oil Co.; reserving 25% of mineral interest above and 50% of the mineral interest below the Mississippian production zone creating a situation that 3,580 mineral acres were not available for sale. (Ex. 5, Mineral Deed; and Ex. 6, Depo. of Randy Miller, pg. 13-15).

17.     That information was not set forth in either the brochure, or communicated to Magid as a telephone bidder. (Ex. 3, Depo. of Magid, pg. 61; and Ex. 7, Depo. of B. Lippard, pgs. 76-77).

18.     Lippard, a member of the NAA, testified that he, as Miller's auctioneer, under the NAA code of ethics, owed buyers at the auction the duty of honesty, integrity and fair dealing. (Ex. 2, Depo. of T. Lippard, pgs. 13, 19-20).

19.    T. Lippard as the auctioneer made an announcement to the auction about the minerals and stated that the information on minerals in the packet was a "little bit" incorrect, because that was a preliminary report we had at the beginning and the exact report that will give you the exact acres, after being considered by a landman and lawyers, was on a table in the back of the room. (Ex. 2, Depo. of T. Lippard, pgs. 68-69; Ex. 37, Partial Transcript of Audio Tape of Mineral Announcement).

20.    One or two days before the auction, Angie Lippard secured a mineral deed showing the Miller/Dye transaction and part of the deed, excluding the exhibit with the legal description that was placed on the table at the rear of the room, in which the auction was conducted. The deed was never furnished to Magid. (Ex. 17, Depo. of A. Lippard, pgs. 156-161; and Ex. 5, Mineral Deed).

21.    On April 25, 2012, Randy Miller attempted to form T. Turner Investments, an Oklahoma Limited Liability Company. (Ex. 8, Articles of Organization).

22.    The Limited Liability Company was to be established solely for the purpose of bidding at the auction, but had no executed operating agreement, no bank account, no tax id, no valid registered agent and has never conducted any business. (Ex. 9, Unexecuted Operating Agreement, Ex. 6, Depo. of Randy Miller, pg. 47-48; and Ex. 38, Depo. of Ronald Miller, pgs. 47-49, 51).

23.    Miller testified that he told Lippard before the auction that he and his brother, through T. Turner, wanted to bid on land at the auction (Ex. 6, Depo. of Randy Miller, pg. 199).

24.     T. Lippard and Miller testified that the day of or the day before the auction, Miller approached T. Lippard and gave him two (2) handwritten sheets containing instructions, for Lippard to bid on certain tracts and the amount up to which he could bid. T. Lippard and Miller testified that the bidding instruction sheets were destroyed and have not been produced in this litigation.  (Ex. 2, Depo of T. Lippard, pgs. 111-114, 125; Ex. 6, Depo. of Randy Miller, pgs. 48-52, 72-73, 169-170; and Ex. 10, T. Turner notes).

25.     The bids that were made by Lippard were purported to be on behalf of T. Turner. (Ex. 2, Depo. of T. Lippard, pg. 127; and Ex. 11, Bidder List).

26.     T. Lippard, Chief Operating Officer of Lippard Auctioneers is a member of NAA. (Ex. 2, Depo. of T. Lippard, pgs. 13-14).

27.     Lippard Auctioneers, Inc. owed ZHN the duty of honesty, integrity and fair dealing. (Ex. 2, Depo. of T. Lippard, pg. 20).

28.     The auctioneer has a duty to disclose when he enters an absentee bid on behalf of a bidder not physically present (Id. pg. 21).

29.     Lippard acknowledges that a seller bidding at the auction of his property is unethical and should not be done. (Id. pgs. 21, 22).

30.     The bidder identification card provided by Lippard to all registered bidders defined "Absolute Auction" as follows: "An auction where the property is sold to the highest qualified bidder with no limiting conditions or amount.  The seller may not bid personally or through an agent.  Also known as auction without reserve." (Ex. 40, Depo. of E. Sheen, pgs. 131-132; Ex. 43, bidding card).

31.    T. Lippard did not advise prospective bidders that he was bidding on behalf of T. Turner (Ex. 2, Depo. of T. Lippard, pg. 127).   Recorded auction announcements do not reveal that such an announcement was made.  No auction participant identified such an announcement. (Ex. 15, Depo. of Haygood, pgs. 36-37; Ex. 39, Depo. of L. Sheen, pg. 41; Ex. 40, Depo. of E. Sheen, pg. 136, Ex. 41, Depo. of Matthew, pgs. 52-53).

32.    T. Lippard did not advise prospective buyers that T. Turner, was controlled by Miller, the controlling member of Miller, LLC, who purportedly owned the property being sold at the auction.  (Ex. 2, Depo. of T. Lippard pg. 72-74).

33.    T. Lippard testified that he was also bidding on behalf of a Mr. McClure, as bidder 215, to purchase one tract of land at his discretion, up to an authorized amount of $200,000.00. (Ex. 2, Depo. of T. Lippard, pg. 117).

34.    T. Lippard did not advise prospective bidders that he was bidding on behalf of Mr. McClure.   Recorded auction announcements do not reveal that such an announcement was made.  No auction participant identified such an announcement. (Ex. 2, Depo. of T. Lippard, pgs. 72-74).

35.    Lippard testified it would be inappropriate for Miller to bid individually or as a member of T. Turner investments because Miller was the seller. (Ex. 2, Depo. of T. Lippard, pg. 223-224).

36.    Miller, as seller, could not bid directly or through an agent at the absolute auction (Ex. 12, Depo. of Jones, pgs. 75, 132-140 and Jones Depo. Ex. 45,  NAA Official Statement Concerning the Proper Ethical Conduct for Absolute Auctions of Real Estate; Ex. 13, Texas Auction Academy, #00143).

37.   Lippard testified that a seller bidding at an absolute auction, or through his agent auctioneer, known as puffing or inflating bids is unethical, not in keeping with honesty, integrity and fair dealing. (Ex. 2, Depo. of T. Lippard, pgs. 21-22).

38.   Jerry Whitney, one of the ringmen for Lippard, was also bidding for T. Turner, under bidder number 420, while purportedly on the telephone.  By virtue of bids made by T. Lippard and Jerry Whitney, T. Turner, was the successful bidder on a number of tracts under three (3) different bidding numbers 212, 420, and 188. (Ex. 14, Depo. of Whitney, pgs. 9-10, Ex. 15, Depo. of Haygood, pgs. 36-38, 42-43, 48, Ex. 42, Notes from Auction by L. Sheen, Sheen 20-24; and Ex. 39, Depo. of L. Sheen, pgs. 22-23, 86-87).

39.   Lippard testified that bids were assigned to 420 in error because bidder card 420 was 'stuck" to bidder card 212.   Lippard testified that bidder 188 did not exist. (Ex. 2, Depo. of T. Lippard, pg. 93; and Ex. 17, Depo. of A. Lippard, pgs. 11, 16).

40.   Notes taken by at least two attendees, show 188 as a high bidder on a number of tracts. (Ex. 15, Depo. of Haygood, pgs. 32-3, 35-70; and Ex. 42, Notes by L. Sheen and Haygood; Ex. 39, Depo. of L. Sheen, pg. 30-31).

41.  Bidder 188 was announced as a runner up bidder, bidding against ZHN and others on a number of tracts. (Id.) (Ex. 15, Depo. of Haygood, pgs. 32-33, 70; and Ex. 39, Depo. of L. Sheen, pgs. 22-23, 86-87; Ex. 42, Notes by L. Sheen, Sheen-20-24).

42.   None of the properties of which T. Turner, was the successful bidder were closed on by T. Turner. (Ex. 2, Depo. of T. Lippard, pg. 85; Ex. 6, Depo. of Randy Miller, pgs. 57, 60-61).

43.     Prior to this auction, Lippard has never been in an absolute auction where a property did not close and considers the number of properties that did not close in this auction unusual. (Ex. 2, Depo. of T. Lippard, pg. 271).

44.     T. Turner never signed a purchase contract or deposited earnest money, which was required by the terms of the auction. T Turner was never asked to sign a purchase contract. (Ex. 2, Depo. of T. Lippard, pgs. 154).

45.     Angie Lippard maintained consolidated auction files in red folders for each winning bidder. The file for T. Turner was destroyed and not produced in this litigation. (Ex. 17, Depo. of A. Lippard, pgs. 26-27).

46.  Randy Miller and his brother, Ronald, testified that they were not involved in the sale of T. Turner tracts after the auction. (Ex. 38, Depo. of Ronald Miller, pg. 93-94).

47.  Ronald and Randy Miller negotiated the sale of T. Turner tracts after the auction. (Ex. 41, Depo. of Matthew, pgs. 42-43).

48.     On August 8, 2012, an evidence preservation notice in anticipation of litigation was sent to Miller, among others.  (Ex. 44, Evidence Preservation Notice).

49.     Electronic records of winning bids purportedly made on behalf of T. Turner were changed to zero after the auction and the "sold" status was removed at the conclusion of each auction day.  Angie Lippard testified that currently the system contains "the most current information" pertaining to high bids.  (Ex. 17, Depo. of A. Lippard, pgs. 41, 46-48, 71, 135; Ex. 16, Clerking Change Log).

50.     Ringman Brady Lippard recorded bidding results at the auction. Those records were destroyed and not produced in this litigation. (Ex. 7, Depo. of B. Lippard, pg. 26, 31).

51.     Ringman Jerry Whitney recorded winning bids and bidder numbers as well as runner up bidder numbers. Those records were destroyed and not produced in this litigation. (Ex. 14, Depo. of Whitney, pgs. 10, 103, 107-108).

52.     Lippard Auctioneers cannot state accurately the amount of high bids made at the auction under bidder numbers 212, 420, 188. These numbers were assigned to winning bids on tracts 3, 4, 5, 7, 8, 9, 14, 20, combination 18-20, 27, 28, 30, combination 30-31, 40 combination 42-44, 52, 66. (Ex. 16, Clerking Change Log; Ex. 17, Depo. of A. Lippard, pgs. 41, 46-48, 71, 135).

53.     Lippard announced at the auction backup/runner up bidders by their bidder number. Lippard has no records of these announcements.     Lippard identified these bidders to Miller's attorney by name on 11-19-2012. Lippard does not have records that were used to generate this runner up list. (Id.)

54.     Proxibid.com, used by Lippard Auctioneers at the May 3rd and 4th Absolute Auction to broadcast the auction, recorded live bids made at the auction as well as those made on the internet. (Ex. 45, Depo. of Wright, pgs. 14-17; Ex. 46, Letter to Wright, 06-26-2014; Ex. 47, E-mail from Wright, 08-03-2014).

55.     One of the tracts bought under bidder number 420 (tract 31) was resold on behalf of Miller on or before May 4th. (Ex. 50, Check from Welch; Ex. 60, Notes of Haygood; and Ex. 15, Depo. of Haygood, pg. 47).

56.     Lippard made an audio recording of the opening announcement on both days, but Angie Lippard turned off the recording before the start of bidding on day one and shortly after the start of bidding on day two. (Ex. 17, Depo. of A. Lippard, pg. 234).

57.     Gary Dye of Dye Oil Company was a successful bidder on each and every mineral tract. As a successful bidder, he deposited earnest money of about $77,000.00. Dye Oil did not close the transaction and he purportedly forfeited the earnest money. The minerals reverted back to the seller. (Ex. 51, Depo. of Dye, pgs. 78-79, 99-100; Ex. 6, Depo. of Randy Miller, pgs. 82-84).

58.     On May 8, 2012, Magid was asked by Angie Lippard, if he was interested in purchasing tracts 3-4, 7-8, 18-20, all of which were tracts on which T. Turner had been the successful bidder. (Ex. 52, E-mail, 05-08-2012).

59.     On or about May 29, 2012, Mr. Magid was again offered tracts 3-5, 7-9, 18-20, this time by Troy Lippard. (Ex. 53, Notes regarding tracts offered to Mr. Magid).

60.     As successful bidder, ZHN executed real estate contracts with Miller, LLC, and deposited the required earnest money, which was accepted by the seller and the auctioneer. (Ex. 18, Contract 05-03-2012; Ex. 19, Contract 05-04-2012).

61.     ZHN paid earnest money on Day 1 Purchase Contract in the amount of $189,250.00.  ZHN paid earnest money on Day 2 Purchase Contract in the amount of $96,700.00.  (Ex. 4 to Miller's Motion; Ex. 3, Depo. of Magid, pg. 121).

62.     The Real Estate Agreements executed by Magid on behalf of ZHN required the seller to provide the evidence of marketable title with a dully certified abstract 25

days prior to closing of June 22, for first day auction properties and 25 days prior to closing June 29, for second day auction properties. (Id.)

63.     The seller was unable to provide proof of that title within those periods of time and requested an extension. (Ex. 20, Supplemental Agreement).

64.     ZHN did not grant the extension.   On July 10, 2012, ZHN requested a return of $173,500 of the Day 1 earnest money. ZHN requested a refund of the earnest money deposited. (Ex. 21, Letter from Tack to Miller and Lippard, 07-10-2012).

65.     On July 11, 2012, Miller rejected ZHN's request for return of a portion of the Day 1 earnest money and advised he was moving forward with closing. (Ex. 22, Letter from Lippard to Tack, 07-11-2012).

66.     On July 13, 2012, ZHN advised that if the earnest money was not returned by July 16, 2012, ZHN would pursue all legal remedies under the contract and the law. (Ex. 23, Letter from Tack to Miller and Lippard, 07-13-2014).

67.     On August 2, 2012, ZHN demanded "mediation concerning all issues under the contracts" as provided in the Purchase Contracts and suggested mediators. (Ex. 24, Letter from Tack to Miller and Lippard, 08-02-2012).

68.     On August 14, 2012, Miller's attorney acknowledged the mediation request (Ex. 25, Letter from Hodgden to Novotny, 08-14-2012).

69.     On September 12, 2012, ZHN, while reserving all rights under the contracts, demanded return within 5 days of the Day 1 earnest money, $189,250 and the Day 2 earnest money, $96,700  (Ex. 26, Letter from Tack to Hodgden and Lippard, 09-12-2012).

70.     That same day, September 12, 2012, Lippard sent an e-mail to the closing

agent, Guarantee Abstract saying they buyer should be pushed to closing on the parcels

that were not in litigation. (Ex. 54, E-mail from A. Lippard, 09-12-2012).

71.     Miller responded by demanding that ZHN forfeit, not retain, the earnest

money. (Ex. 27, E-mails from Hodgden, 09-26-2012).

72.     Miller did not attend the mediation, but sent counsel, John Hodgden. (Ex. 6,

Depo. of Randy Miller, pg. 207).

73.     The mediation was unsuccessful and litigation followed November 21,

2012. (Doc. 1; Ex. 29, Letter from Hodgden, 11-21-2012).

74.     On the day of the mediation, November 20, 2012, Lippard emailed

Richardson advising, "we had a mediation today but nothing was settled. We told them to

either close according to the contract price or we would give them earnest money back

and they didn't want to do either. My seller's attorney recommended that we sign the

release and send back the earnest money. We will see what happens." (Ex. 28, E-mail

from Lippard, 11-20-2012).

75.     On November 21, 2012 Miller's attorney confirmed that no agreement had

been reached for ZHN to accept return of the earnest money and tendered to ZHN a

proposed Release of Earnest Money signed by Miller. (Ex. 29, Letter from Hodgden to

Abowitz and proposed Release of Earnest Money, 11-21-2012).

76.     On November 25, 2012, ZHN tendered a proposed Release of Earnest

Money with Reservation of Rights, signed by Magid, specifically reserving all rights in

this litigation (attached) and reserving all rights ZHN had against any person or entity in

19

any way related to the contracts or the auction. (Ex. 30, Release of Earnest Money with Reservation of Rights).

77.    In January of 2013, Miller and ZHN signed Guarantee Abstract's short form Release of Earnest Money that acknowledged that Miller and ZHN "each has signed a separate Release of Earnest Money which are attached hereto, and reserving all rights each has against the other" and directed Guarantee Abstract to return the earnest money to ZHN. (Ex. 31, E-mails with Bolz, 01-07-2013; Exs. 10-11, Miller's Motion, Releases of Earnest Money).

78.    On or around January 18, 2013, Guarantee Abstract wired the earnest money to ZHN. (Ex. 32, E-mail from Bolz, 01-18-2014; Ex. 9, Miller's Motion, Wire Confirmations).

79.    In a letter dated September 24, 2013 to Michael Brown, Troy Lippard stated "I have submitted everything that I have of any kind in the first subpoena and have nothing further to submit." (Ex. 55, Letter from Lippard to Brown, 09-24-2013).

80.    Since that date many responsive documents withheld by Lippard were discovered by ZHN or produced by Lippard. Among them are: high bidder/runner up list (Ex. 56), Clerking Change Log (Ex. 16), notes with tract numbers and prices that appear to be bidding instructions from Miller (Ex. 10).

81.    During Angie Lippard's deposition, the last representative of Lippard to be deposed at 2:30 in the afternoon, Lippard produced copies of the red folders and their content, except for the T. Turner folder. (Ex. 17, Depo. of A. Lippard, pgs. 8-10, 16).

82.    On the same day Lippard produced cell phone records for Angie and Troy Lippard covering the days of the auction. (Ex. 57, E-mail from Tidmore, 12-09-2014).

83.    ZHN alleges it was damaged by shill bidding during the May 3rd and May 4th Absolute Auction perpetuated by Lippard Auctioneers, Inc., its individual employees and the Miller Defendants.  The bidding was tainted and did not result in arm's length transactions.  ZHN is entitled to take land on which it bid, at the price of the last valid bid.  The damage to ZHN on the surface tracts, which include income and appreciation on the land until September 30, 2014 is $5.8 Million. (Ex. 58, ZHN Answers to Randy Miller's First Interrogatories; Ex. 59, Supplement of ZHN to Interrogatory No. 12).

84.    The mineral properties were misrepresented regarding the mineral acres that were being sold.  The successful high bidder on each mineral property was a shill who did not close on any successful bid.  The damages are the value of the property on which ZHN was the high, good faith bidder as advertised, less the last good faith bid. The mineral damages sustained by ZHN equal are $5.2 Million. (Id.)

85.    On November 21, 2012 ZHN filed this action, CIV-12-1289-M. (Doc. #135, Miller's Motion, Statement of Fact #7).

## Argument and Authorities

### I.    Summary Judgment Standard

Under Fed.R.Civ.P. 56(c) summary judgment is proper only if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates there is no genuine issue as to any material fact and the moving party is entitled to summary judgment as a matter of law. *Allen v. Minnstar*, Inc., 8 F.3d 1470, 1476 (10th Cir. 1993).

"When applying this standard, [the Court] examines the record and reasonable inferences drawn therefrom in the light most favorable to the non-moving party." *19 Solid Waste Dep't Mechanics v. City of Albuquerque,* 156 F.3d 1068, 1071-72 (10th Cir. 1998) (internal citations and quotations omitted).

A "material" fact is one "that might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) and a "genuine" issue is one where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

## II. While Oklahoma law will apply in this case, because Oklahoma case law on "absolute" auctions is not well developed, this Court should consider U.S. Supreme Court cases, law review articles, and cases dealing with auctions from other jurisdictions.

Plaintiff agrees generally that Oklahoma law should apply in this case. Although the Oklahoma legislature enacted legislation criminalizing what Miller and the other Defendants did here, obtaining Plaintiff's signature to a contract and money from Plaintiff by means of a "mock auction," (See 21 O.S. § 1506)[4], Oklahoma case law discussing civil actions based on auctions, particularly "absolute" or "no-reserve" auctions, is sparse or non-existent. Fortunately, the United States Supreme Court had the occasion back in 1850, in *Veazie v. Williams,* 49 U.S. 134 (1850), to address "puff"

---

[4] Defendants here may also have violated federal criminal statutes. William Mastro and others were criminally indicted in 2012 in the United States District Court, Northern District of Illinois, for mail and wire fraud, in violation of Title 18, United States Code, Sections 1341, 1342 and 1343, for engaging in acts during auctions *that closely mirror the Defendants' conduct (shill/puff/by-bidding) complained of in the case at bar.* Mastro entered a plea of guilty to mail fraud in October of 2013. *See* Doc. # 1, Indictment, and Doc. # 99, Plea Agreement, Case No. 1:12-cr-00567, U.S. District Court, Northern District of Illinois, Eastern Division.

bidding and the remedies available to a victim of auction fraud like that employed by Miller here. *Veazie* should provide valuable assistance to this Court in this case.

It should also be noted that a distinguished member of the faculty at the University of Oklahoma College of Law, Professor Drew Kershen, who has taught and written for years in the field of agriculture law, has written a comprehensive two-part law review article, thoroughly examining every aspect of "absolute" auction fraud, that would likely also be beneficial to this Court. *See* Kershen, "Horse-Tradin': Legal Implications of Livestock Auction Bidding Practices" Arkansas Law Review 37 (1983): 119-216.[5] And while Miller may try to distinguish auction fraud at an "absolute" auction of real estate, from auction fraud at an "absolute" auction of personal property, the law recognizes little or no distinction – it makes little sense that there should be a distinction. For example, Oklahoma prohibits deceptive trade practices, whether committed during the sale of either real or personal property. *See* 15 O.S. §§ 751-763.

### III. Oklahoma's Uniform Commercial Code section that provides a remedy for the victim of auction fraud at an auction of goods, 12A O.S. § 2-328, should be applied by analogy in this case.

It would be beneficial at the outset to review the legal boundaries of an "absolute" auction (also referred to as a "no reserve" or "without reserve" auction). The fundamental principles that guide how "absolute" auctions of real estate should be conducted are succinctly summarized in an official statement issued by the National

---

[5] Professor Kershen's article does not appear available on Westlaw. The article can be viewed at http://works.bepress.com/drew_kershen/69/

Auctioneers Association ("NAA").[6]   In response to growing public complaints concerning sales methods some unscrupulous auction companies employ in auctions of real estate advertised as "absolute," in order to attract interest in the sale without a true intention of selling the property to the highest good faith bidder, the NAA developed an Official Statement concerning proper ethical conduct for absolute auctions of real estate ("Official Statement"). (Ex. 12, NAA Official Statement Concerning the Proper Ethical Conduct for Absolute Auctions of Real Estate).

The NAA Official Statement warns that "an auctioneer must not circumvent a sale represented to the public as 'absolute' under circumstances where there is no true intention to sell the real estate to the highest bidder regardless of price" because to do so, "the auctioneer would be perpetrating a fraud upon those in attendance." *Id.* at 2 (emphasis added).   The Official Statement makes clear that "no auction should be advertised 'absolute' or 'without reserve' unless there is a bona fide intent to transfer ownership at the time of advertising and at the time of auction, regardless of the bid or bidder." *Id.* at 3

> 'Shill' bidding (also referred to as 'by-bidding,' 'ghost bidding' and 'puffing') or any other schemes to inflate bids are not permitted under the NAA Code of Ethics. Auctioneers should never employ such tactics as a means to artificially inflate bids or circumvent the previously declared intention to sell the property to the *highest good faith bidder*. Beyond these ethical considerations, in virtually every jurisdiction an auctioneer is prohibited by law from knowingly receiving a bid on a seller's behalf or permitting the seller to make or procure such a bid unless notice has been given that liberty for such bidding has been reserved."

---

[6] Lippard, Miller's agent and auctioneer, testified that he adheres to the NAA Code of Ethics. (AF 26). As used herein, "Lippard" refers to Lippard Auctioneers, Inc. and all of its employees, including Defendants T. Lippard, Angie Lippard, Brady Lippard and Jerry Whitney.

*Id.* at 3 (emphasis added).

These fundamental principles governing "absolute" auctions, meant to deter fraud and to promote market efficiency, are neither new, nor narrowly recognized. They are found in both statutory law and the common law, dealing with auctions of both real property as well as personal property. Even criminal law recognizes and enforces these norms.

Long before the Uniform Commercial Code ("UCC") was enacted, in one of the earliest cases to address "puffing," the United States Supreme Court fashioned for the victim of "puffing" at an auction of real property, an equitable remedy that deprived the seller and auctioneer of the benefits of the fraud. *Veazie v. Williams*, 49 U.S. 134 (1850). "[T]he Supreme Court used its equitable powers to devise a remedy which allowed the buyer at auction to take the property for the last bid made prior to bids being entered on behalf of the seller."[7] Kershen, supra, 37 Ark.L.Rev. at 136, n. 42. The Court in *Veazie* "explicitly used this remedy because it deprived the seller of all economic benefits the seller had hoped to gain by using a puffer." *Id.* Professor Kershen's article provides a thorough examination of auction fraud and provides keen insight into what courts can and should do about it.

---

[7] The last bid made prior to bids being entered on behalf of the seller is today referred to by Professor Kershen and the drafters of the Code as the "last good faith bid." *See* 12A O.S. § 2-328(4) and see Kershen, Horse Tradin', 37 Ark.L.Rev. 119, 131-139. The NAA makes reference to the "highest good faith bidder." (Ex. 12, NAA Official Stmt., at 3).

Professor Kershen credits *Veazie* as the likely source of the provision in UCC Section 2-328 for the alternate remedy that permits the victim of "shill" bidding, *at his option,* to "avoid the sale or take the goods at the price of the last good faith bid." Kershen, supra, 37 Ark.L.Rev. at 145 n. 58. The auction in *Veazie* was one of real property – not goods. There the victim of the auction "puffing" was induced to bid $40,000 for the real property. The Supreme Court set aside the actual $40,000 sale price and permitted the buyer to purchase the property for $20,000, the price of last bid made prior to bids being entered on behalf of the seller. *Veazie,* 49 U.S. at 162-163.

The policy reason underlying the remedy for shill bidding fashioned in *Veazie* and UCC 2-328 is the same. Absent such remedy the buyer, once he learns he has been defrauded, is faced with the dilemma of either having to rescind the sale, thereby losing the property he wanted to purchase (with no real consequence to the seller or auctioneer who engaged in fraud[8]), or paying the inflated price affected by the "shill" bidding (thereby rewarding those who engaged in fraud). As noted by Professor Kershen, "This all or nothing remedy seems unfair to the good faith buyer." Kershen, supra, 37 Ark.L.Rev. at 145 n. 58. The alternate remedy of permitting the buyer to enforce the sale at the price of the last good faith bid, recognized by both the Code drafters and the Supreme Court in *Veazie,* fairly and justly solves the buyer's dilemma.

---

[8] In such a scenario, the seller and auctioneer would be unjustly enriched by their acts of fraud. And by shill bidding, the seller creates a false, inflated market price for every remaining property sold at the auction and commits a fraud on the public.

Courts in other jurisdictions, as likely would the Oklahoma Supreme Court, have applied, by analogy, UCC § 2-238 to auctions for real estate. See *Young v. Hefton,* 173 P.3d 671, 675-676 [Kan. App. 2007]. The Court in *Cuba v. Hudson & Marshall, Inc.,* 445 S.E.2d 386, 387, n.1 (Ga. Ct. App. 1994) noted that, although the UCC does not apply directly to the sale of real estate at auction, "Courts in other states have recognized that [UCC Section 2-328] reflects common law principles applicable to land auctions as well as auctions of goods . . . and have borrowed rules from it or applied it to land auctions by analogy. See, e.g., *Chevalier v. Sanford*, 475 A.2d 1148 (Me. 1984); *Hoffman v. Horton*, 212 Va. 565, 186 S.E.2d 79 (1972)." *Cuba,* 445 S.E.2d at 387, n 1.

## IV.   Plaintiff has neither rescinded the real estate purchase contract nor elected a remedy

Miller's rendition of facts to support his rescission argument creates a false impression. Glossing over the important details of what actually happened, Miller claims in his Motion that "Plaintiff refused to close and demanded return of its earnest money," and that Miller "allowed the transaction not to close, and *agreed to return* and returned the earnest money to the Plaintiff thereby completing the rescission of the written contract for the purchase of the real property." (Doc. #135, Miller's Motion, at 7-8)(emphasis added).

The details that Miller omits show that in July of 2012 Miller flatly rejected Plaintiff's initial request for return of only a *portion* of the Day 1 earnest money. (AF 65). In response to Miller's rejection, Plaintiff immediately announced it would seek all legal remedies available under the contracts and the law. (AF 66). Plaintiff followed up with a

request for mediation (the contracts required mediation before resorting to litigation). (AF 67).

In September of 2012, while awaiting mediation, Plaintiff demanded for the first time that Miller return *all of the earnest money* paid on the Day 1 and Day 2 contracts. (AF 69). Strongly suspecting fraud on the part of Miller and his agent Lippard, ZHN made clear in its demand for return of all of the earnest money that in making the demand, Plaintiff was *reserving all rights under the contracts*. (AF 69). In making the demand, ZHN was not seeking to annul or cancel the contracts. ZHN simply wanted the $295.595.00 in earnest money, not an insignificant sum, out of the reach of the party who it suspected of fraud, and housed instead in ZHN's account pending resolution of its claims. The demand had a five-day window for Miller to comply.   (AF 69). Miller responded that *he was keeping* – not returning – the earnest money. (AF 71)   Miller then (through his agent Lippard) advised the closer, Guarantee Abstract, "to push [ZHN] to closing on the parcels that we are not in litigation on." (AF 70).

ZHN filed this action on November 21, 2012, one day after the unsuccessful mediation.[9]   At or after the unsuccessful mediation, Miller, realizing that Plaintiff had pieced together the fraud, for the first time proposed to return all of the earnest money to ZHN.  (AF 74).   Miller, through both his agent Lippard and his attorney Hodgden, acknowledged *that no agreement was reached at the mediation for ZHN to accept return of the earnest money*. (AF 75).   Shortly thereafter, Miller signed and tendered a proposed

---

[9] The night before the mediation, after Plaintiff had flown to Oklahoma City from Utah to attend the mediation, Miller announced he would not attend and instead sent his attorney.

Release of Earnest Money that ZHN refused to sign (because signing the document might have left open the question of whether ZHN was reserving or waiving its rights to proceed on its claims in the then-pending litigation). (AF 75). Days later, ZHN countered with its own, different proposed Release of Earnest Money, that expressly reserved all claims ZHN had asserted against Miller in this litigation. (AF 76). Miller refused to sign ZHN's proposed document.

Finally, nearly a month later, Guarantee Abstract, the closer holding the escrowed funds, tendered a short-form Release of Earnest Money that both parties separately signed that expressly provided that "each has signed a *separate* Release of Earnest Money which are attached hereto, and *reserving all rights each has against the other* ..." and authorized the transfer of the funds. (AF 77)(emphasis added). It was only *after* this document, acknowledging reservation of all rights ZHN had against Miller, was signed that the closer wired the funds to Plaintiff.

All of these facts, taken together, wholly *negate* Miller's implication that the parties consented to and agreed to rescind the contracts. And while Plaintiff would urge that the tendered evidence affirmatively and conclusively shows that the parties did not mutually agree to rescind the contracts, at a minimum there is sufficient evidence tendered to create a jury question on this issue.

Beyond that, Miller is not entitled to summary judgment on the rescission argument for a number of other reasons. First, Miller has not pled rescission as an affirmative defense or as a counterclaim. He claims nowhere in his Answer and

29

Counterclaim that the contracts were rescinded[10]. Rather, in his counterclaim filed nearly one year after the money was released, *he acknowledges the continued existence of the contracts* by asserting a breach of contract claim against Plaintiff. (Doc. # 40, Miller's Answer and Counterclaim, at 7-10). This is inconsistent with his newly minted argument that the contracts were rescinded. If anyone has elected remedies, it is Miller, and he has elected to seek enforcement of the contracts.

Even if Miller now claims rescission alternatively to his breach of contract claim, he has failed in his Motion to show that he is *entitled* to rescission. Plaintiff's tendered evidence shows that Miller, through his entities and his agents, engaged in auction fraud. (AF 12-59). Miller has *unclean hands* and is not entitled to *equitable* relief in the form of rescission. *See Eresch v. Braecklein*, 133 F.2d 12 (10th Cir. 1943) ("It is well settled that it is only fraud or willful misconduct which bars one from recovering in a court of equity under the maxim, 'He who comes into equity must come with clean hands.'"); see also, *Precision Instr. Mfg. Co. v. Automotive Maint. Mach. Co.*, 324 US 806, 814-815 (1945).

Miller would also have to show, which he has not done in his Motion, that **he** (not ZHN) *promptly* rescinded in order to establish a defense to Plaintiff's contract claims. Miller's failure to *promptly* offer to return the entirety of Plaintiff's earnest money precludes Miller from seeking the remedy of rescission. The requirement of prompt action by a party seeking rescission under 12 O.S. § 235 is strictly enforced. *Federal Deposit Insurance Corp. v. Palermo*, 815 F.2d 1329, 1339 (10th Cir.1987).

---

[10] Indeed, Miller denies that Plaintiff is entitled to *avoidance* of the contracts induced by misrepresentation, fraud and deceit. (Doc. #78 Miller's Answer, at 8).

> Under § 235, the party attempting rescission must act "promptly, upon discovering the facts which entitle him to rescind" and <u>must offer to return everything of value</u> which he has received under the contract. <u>The prompt action requirement is strictly enforced.</u> *Harmon v. Phillips Petroleum Co.,* 196 Okla. 607, 610–11, 167 P.2d 360, 364–65 (1946) (<u>five-month delay barred rescission</u>); *Creach v. Home Owners' Loan Corp.,* 191 Okla. 484, 485, 131 P.2d 108, 110 (1942) (sixteen-month delay barred rescission); *see also Appliance Distributors, Inc. v. Mercury Electric Corp.,* 202 F.2d 651, 654 (10th Cir.1953).

*Palermo,* 815 F.2d at 1339 (*citing* 15 O.S. § 235) (emphasis added).  The only thing Miller did *promptly* (he did so within 24 hours, AF 65) was *to reject* Plaintiff's initial request for a return of a *portion* of the Day 1 earnest money.

Miller's rejection in July of Plaintiff's initial proposal and Miller's demand that the contracts be closed also preclude him from now claiming that he actually *accepted* a proposal by Plaintiff to rescind the contracts without reservation of rights.  In *Appleman v. Pepis,* 246 P. 225, 227 (Okla. 1926) the Court refused to enforce a claimed rescission, holding that the appellant had merely demonstrated that the other party had *offered* to rescind,

> The appellants rely on the notice of Olson to rescind as a complete defense in this action. This plea does not go far enough; Appleman must go far enough to show that he accepted the offer of Olson to rescind and agreed to the rescission.
>
> * * *
>
> <u>The position of the appellants would be well taken</u> in this case <u>if they had accepted the offer to rescind</u> as made by Olson.

*Id.* at 227 (emphasis added).  And in September, two months after flatly rejecting Plaintiff's initial demand for return of a portion of the earnest money, Miller did not

31

accept Plaintiff's demand for return of *all* of the earnest money.    Instead, Miller

demanded forfeiture of the earnest money and <u>again</u> sought *to close the parcels not in*

*litigation[11]*.   (AF 657, 71).   Miller could not close a contract that he and ZHN had already

agreed to rescind.

Miller indirectly suggests, under the guise of rescission, but without using this

label, that the parties entered into an accord and satisfaction when they agreed in January

2013 that the earnest money would be transferred to ZHN's account.    On this claim

Miller also must fail.

"The quintessence of an accord and satisfaction is that, upon completed

performance of the accord, there is a discharge of the contractual obligations spelled out

in the original contract." *Morrow Dev. Corp. v. Am. Bank & Trust Co.*, 1994 OK 26, ¶8

(Okla. 1994).  Oklahoma law requires that, in order for the defense of accord and

satisfaction to succeed, "a jury must find that the parties must intended a subsequent

agreement to discharge a prior obligation." *Transpower Constructors, Div. of Harrison*

*Int'l Corp. v. Grand River Dam Authority*, 905 F.2d 1413, 1419-1420 (10th Cir. Okla.

1990)(citing *Polin v. American Petrofina Co.*, 589 P.2d 240, 242 (Okla. Ct. App. 1978)).

Indeed, "the evidence must show a meeting of the minds of the new promise, and that it

was made and accepted <u>with the purpose and intent that it should operate as a discharge</u>

of the prior obligation[.]" *Polin*, 589 P.2d at 242 (Okla. Ct. App. 1978)(citing *In Gooldy*

---

[11] This interpretation that certain contract parcels were "in litigation" preceded the actual
litigation by more than two months and is inconsistent with the suggestion the parties had
already agreed to rescind the contracts.

*v. J.B. Klein Iron & Foundry Co.*, 170 Okl. 466, 40 P.2d 1070 (syllabus))(emphasis added).

The tendered evidence shows there was no meeting of the minds for the contracts to be rescinded or the parties to be discharged when, in January 2013, Guarantee Abstract was given the green light to deliver the $285,950 it was holding to ZHN. In the short-form Release of Earnest Money that both parties signed, <u>ZHN and Miller expressly reserved all rights each had against the other.</u> This fact destroys any argument that Miller might make, directly or indirectly, that the parties entered into any agreement that resolved ZHN's outstanding breach of contract and fraud claims against Miller. Miller's motion for summary judgment on the grounds of rescission should be denied.

Because Miller cannot establish that the parties actually agreed to rescind the contracts, Miller's argument that Plaintiff has elected a remedy also breaks down. And the Tenth Circuit, interpreting Oklahoma law, has held that a plaintiff may pursue both its breach of contract claims and fraud claims without election.

> Before turning to the merits on this issue, however, we briefly consider a threshold issue—whether Oklahoma law allows a plaintiff to bring simultaneous claims for fraud and breach of contract. Oklahoma law on this point is well settled. While a party may not obtain double recovery, election of remedies is not required. See *Rogers v. Meiser*, 68 P.3d 967, 970 n. 5 (Okla.2003); *Howell v. James*, 818 P.2d 444, 447–48 (Okla.1991).

*Specialty Beverages, LLC v. Pabst Brewing Co.*, 537 F.3d 1165, 1180 (10th Cir. 2008). While Miller acknowledges in his Motion that "the doctrine of election of remedies was generally abandoned when the legislature adopted the   Oklahoma Pleading Code in 1984," (Doc. #135, Miller's Motion, at 7), Miller relies on pre-1984 Pleading Code cases

from 1921, 1916, 1918, 1934, 1957 and 1929 to argue that a plaintiff must elect to "either (1) enforce the contract or (2) rescind the contract ..." *Id.* at 8, 10. These cases should be ignored because current law recognizes that no election is required. *Specialty Beverages*, 537 F.3d at 1180.

Miller argues at p. 10 of his Motion, again relying on cases that pre-date the 1984 Oklahoma Pleading Code, that a partial rescission may not be had. The tendered evidence shows there was **no** agreed upon rescission, let alone a partial rescission. The parties simply agreed for the funds being held by Guarantee Abstract to be transferred to ZHN with the written understanding that each party retained all rights it had against the other.

Moreover, the law recognizes there may be certain cases, like the case before this Court, where both rescission and damages are necessary in order to make a plaintiff whole. The Oklahoma Supreme Court in *Larkin v. Tallant*, 206 P.2d 982, 986 (Okla. 1949) recognized that the particular facts of a case should determine what remedies are available and that a court is not bound by the rigid election of remedies doctrine, leaving a plaintiff with only an either/or choice of rescission or damages. In *Larkin* the Court stated,

> Election of remedies is defined as being choice, shown by some overt act, between two or more inconsistent rights, either of which may be asserted at the will of the chooser alone. It is also said that the purpose of this doctrine is not to prevent recourse to a remedy, but simply to prevent double redress for a single wrong, but it is also true that election must be predicated upon a state of facts giving a party an option of adopting or rejecting one theory of action.

Herein a different situation prevailed. Plaintiff had a right which he was bound to exercise within a specified period. Because of defendants' deceitful conduct he not only was prevented from doing this, but defendants further removed any possibility of performance by fraudulently consummating a sale of the property with a third party.

It would be a peculiar rule indeed which would decree that a party could grant an option and by his own conduct make it impossible of performance, but that the holder of the option must elect to sue to recover his deposit without claiming damages, or forfeit his deposit and seek recovery for his damages which possibly might not be so susceptible of proof. We decline to pronounce such a rule.

*Id.* at 986(citations omitted)(emphasis added).

In the case at bar, Miller, through his deceitful conduct, not only obtained a written contract from Plaintiff at inflated prices for the land, but he also deprived Plaintiff the opportunity to buy the properties at a fairly conducted absolute auction – free of Miller's and Lippard's fraudulent and illegal bids. To return Plaintiff to his pre-auction status by simply returning Plaintiff's earnest money is an inadequate remedy and would deprive Plaintiff of the property he sought to buy at a fairly conducted absolute auction and would allow the Defendants to have accomplished what they set out to do – to deceive the public through shill/puff/by-bidding by creating a false market for the properties, thereby inducing inflated bids; and to set a secret reserve in what was advertised as an "absolute auction," through which Miller could, by bidding through Lippard, make sure that if properties did not reach the secret reserve, they would not sell. This is, by definition, a "mock" auction.

The Supreme Court in *Veazie* and the Uniform Commercial Code at § 2-328 recognize that in such instances, to make the plaintiff whole, a victim of this type of

conduct should be permitted <u>both</u> to <u>partially rescind</u> the fraudulently induced portion of the contract to the extent the price exceeded the price of the last good faith bid, and <u>to enforce</u> the contract – not at the fraudulently induced contract price – but at the price of the last good faith bid. And as provided in 15 O.S. §233B, in an action seeking rescission of a contract, the court is permitted "to adjust the equities between the parties." That is what the Court did in *Veazie* – it adjusted the equities between those who engaged in auction fraud and the victim of the fraud to enforce the sale contract at the price of the last good faith bid.

Finally, Miller offers no authority or argument suggesting that rescission is a defense to ZHN's claims of interference with prospective economic advantage or violation of the Oklahoma Consumer Protection Act (15 O.S. §§ 751-764). (See Doc. # 76, Plaintiff's Third Amended Complaint, at ¶¶ 78-85). Because Miller has not shown that he is entitled to summary judgment, his Motion should be overruled.

### V. Miller, individually, is liable to Plaintiff because he engaged in the tortious acts complained of.

In giving Lippard bidding instructions prior to the auction, Miller individually participated in the torts upon which Plaintiff sues. (AF 24). Miller failed to disclose to Plaintiff that Miller had deeded away the majority, and most valuable part of the "mineral acres" that he offered at the auction. (AF 16, 17, 19).

"Under Oklahoma law, an officer may be held liable for the torts that he personally commits." See *Okla. Federated Gold & Numismatics, Inc., v. Blodgett,* 24 F.3d 136, 141 (10th Cir. 1994); and see *Smoot v. B & J Restoration Servs., Inc.,* 279 P.3d

805, 814 (Okla. Civ. App. 2012) (corporate officers may be individually liable for their tortious conduct even if they are acting on behalf of the corporation and regardless of whether a corporation may be held vicariously liable for the torts of its officers and directors).

Miller errantly argues in his motion that Plaintiff "does not identify any claims against Miller individually" in the Third Amended Complaint. (Doc. #135, Miller's Motion, at p. 14). Plaintiff specifically makes claims against and implicates Miller individually in the tortious conduct complained of at ¶¶ 13 – 16, 21, 33 – 35, 43, 45 – 48, 53 – 62, and 76 – 90, and 95-99 of the Third Amended Complaint. (Doc. # 76, Plaintiff's Third Amended Complaint).

Clearly Plaintiff identifies claims against Miller individually and complains that Miller individually participated in the tortious conduct. And as set forth below, Miller, who signed the Auction Agreement in his individual capacity (AF 4), is also individually liable for the torts of his auctioneer agent, Lippard, regardless of his participation in the torts.

VI.     **Miller, individually, and Miller, LLC are liable for the acts of their agent Lippard.**

There is no real dispute in this case that Lippard was Miller's agent in conducting the May 3-4 "absolute" auction of Miller's real estate and mineral interests. Miller admitted this fact in his Answer to Plaintiff's Third Amended Complaint. (Doc. 78, Miller's Answer to Plaintiff's Third Amended Complaint, ¶ 13). Plaintiff's evidence shows that Miller, LLC and Miller individually owned the properties that Lippard

auctioned on May 3-4. (AF 4, 5). Miller *individually* signed written Auction Agreement with Lippard for the sale/auction of the 9,740± acres. (AF 4).

"That an auctioneer is a general agent for the owner usually, though questioned in the argument, cannot be doubtful." *Veazie v. Williams*, 49 U.S. 134, 152 (1850). At an "absolute" auction, according to the National Auctioneers Association ("NAA"), an organization to which Lippard belongs (AF 26), "The seller may not bid personally or through an agent." See, Glossary of Terms, Absolute Auction, http://www.auctioneers.org/glossary. Lippard, Miller's agent, bid at the May 3-4 auction on behalf of Miller (AF 24-25) thus converting the "absolute" auction into a mock auction. As noted herein, Oklahoma criminal law prohibits mock auctions. *See* 21 O.S. § 1506.

Under the NAA Code of ethics, to which Lippard subscribes (AF 26-29), "Members shall not misrepresent or conceal material facts" and "Members are duty bound at all times to abide by the laws and regulations which govern them." *See* NAA Code of Ethics, Articles 9 and 10, http://www.auctioneers.org/code.  The Oklahoma Consumer Protection Act defines as an "unfair trade practice" any practice that violates public policy, is unscrupulous or *unethical*, or substantially injurious to consumers" 15 O.S. § 752(14) (emphasis added).  Miller, as principal, is liable for the tortious acts of his agent Lippard.

And as recognized by the U.S. Supreme Court in *American Soc. of Mech. Eng., Inc. v. Hydrolevel Corp.*, 456 U.S. 556 (1982), under general rules of agency law,

principals are liable for the harm caused when their agents commit torts while acting with apparent authority.

"And it is a familiar and universally accepted rule that a principal is liable for the frauds and misrepresentations of his agent within the scope of his authority or employment even though he had no knowledge of such representations." *Amen v. Black,* 234 F.2d 12, 20 (10th Cir.1956).

> The principal is liable to one who relies upon the deceitful representations of the agent, 'if those representations are apparently authorized, or usually accompany or are incidental to transactions which he is authorized to conduct, provided the other party has no notice that the representations are unauthorized.' 2 Am.Jur., Agency, § 362; see also Restatement Agency, §§ 257, 258.

*Amen*, 234 F.2d at 20; *See* also *Shrier v. Morrison*, 357 P.2d 196, 201-202, (Okla. 1960).

Lippard's knowledge, as agent, is imputed to Miller, as principal. "It is a generally recognized rule of law that the knowledge of the agent is imputed to the principal in connection with any transaction conducted by, or participated in by the agent in behalf of the principal." *Gibson Oil Co. V. Hayes Equip. Mfg. Co.*, 21 P.2d 17, 19 (Okla. 1933). Lippard knew that a seller could not bid at his own absolute auction. (AF 29, 30). Thus, through this imputed knowledge, Miller knew that it was unethical and illegal to have Lippard bid for him at the auction.

Miller can also be held liable for the fraudulent conduct of Lippard because he knew of and encouraged the fraudulent behavior, and because he accepted the fruits of the fraud. (AF 24-25). In *King v. Horizon Corp.*, 701 F.2d 1313, 1318 (10th Cir. 1983) the Court held,

> The fraud of an agent may be attributed to the principal in a number of ways. First, it is clear that where the principal knows of and encourages the fraudulent behavior of his agent he is going to be liable for that fraudulent behavior himself and cannot avoid that liability through the use of a disclaimer clause. Second, if the principal accepts the fruits of the fraud, with knowledge of the misrepresentations by which the fraud was accomplished, he has ratified the fraudulent act and will be liable for it.

*Id.* In this case, Miller directly participated in Lippard's tortious and fraudulent acts. Miller provided bidding instructions to Lippard in advance of the auction. (AF 24).

It is settled law in Oklahoma that a principal is liable for tortious acts of his agent even though the actions exceed the authority conferred or were willfully or maliciously committed if such acts are incidental to and in furtherance of the business of the principal. *Roring v. Hoggard,* 326 P.2d 812, (Okla. 1958) (Syl. 1 & 2). *See Dill v. Rader,* 533 P.2d 650 (Okla.App.1975).

Thus, Miller, as principal, is liable to Plaintiff for the acts of his agent, Lippard. Plaintiff's evidence shows that Lippard conducted a mock auction, defrauded and deceived Plaintiff during and after the auction, engaged in deceptive practices in violation of the Oklahoma Consumer Protection Act, and interfered with the prospective economic advantage Plaintiff should have enjoyed at an honestly conducted "absolute" auction. Plaintiff has set forth sufficient evidence, when viewed in the light most favorable to Plaintiff, to create, at a minimum, a genuine jury issue as to whether Miller is liable by virtue of his own conduct and for the acts of his agent, Lippard. For these reasons, Miller's Motion should be denied.

**VII.   Miller is not insulated from liability by the business judgment rule.**

Miller argues in his motion that because he was acting as manager of his limited liability company, he is immune from personal liability under the "business judgment rule" as provided in 18 O.S. §2016. The "business judgment rule" has no application in this fraud suit brought by Plaintiff, a non-member of Miller's limited liability company.

The Tenth Circuit has explained the rationale of the rule as one "long developed *in actions brought against corporate officers and directors by stockholders and former stockholders* concerning decisions of such officials calling for the exercise of their discretion as to significant corporate matters, made in good faith." *Financial Industrial Fund, Inc. v. McDonnell Douglas Corp.*, 474 F.2d 514, 518 (10th Cir.) (citation omitted)(emphasis added). Other courts have similarly recognized the limitation of the rule to internal disputes.

> … the Business Judgment Rule does not pertain to third party disputes, but only to cases in which a director is sued "in an action by the corporation on its own behalf, by shareholders acting derivatively on behalf of the corporation, by shareholders suing individually on their own behalf or as a class, or by a regulatory body that has assumed control of the corporation."

*Frater v. Tigerpack Capital, Ltd.*, 1999 WL 4892, at *4, (S.D. N.Y. 1999) (citation omitted).

The very case that Miller cited in his Motion in support of his argument expressly and succinctly rejected Miller's position as inappropriate in a case like this one. In *MTG Guarnieri Mfg., Inc., v. Clouatre*, 2010 OK CIV APP 71, ¶ 23, 239 P.3d 202, 213, the plaintiff, a business competitor, sued the defendant, who was manager of a limited liability company, individually for misappropriating trade secrets and tortious

interference with business relations.  The defendant manager made the same argument that Miller makes here, that under 18 O.S. § 2016 a manager of a limited liability company is protected from individual liability under the business judgment rule.  The Court of Civil Appeals disposed of the argument in four short words, "… this statute is inapposite."  *MTG Guarnieri*, 239 P.3d at 213 (footnote omitted).  According to the Oxford dictionary, "inapposite" means "out of place or inappropriate."

Miller's motion for summary judgment based upon the "business judgment rule" should be overruled.

### VIII.  The veil of Miller LLC may be pierced because Miller used the entity to commit fraud.

Miller concedes in his Motion that "Miller, as manager, could also be liable for the LLC's acts if the Plaintiff fulfilled its burden that the corporate veil of protection should be pierced." (Doc. #135, Miller's Motion, at p. 13). Plaintiff has demonstrated through its tendered evidence that Miller and his limited liability company engaged in fraud, one of the recognized grounds under Oklahoma law for disregarding a corporate entity. (AF 13, 14, 17-22).

"Oklahoma has long recognized the doctrine of disregarding the corporate entity in certain circumstances[,] … *under the legal doctrines of fraud*, alter ego and when necessary to protect the rights of third persons and accomplish justice." *Fanning v. Brown,* 85 P.3d 841, 846 (Okla.2004) (emphasis added).  Under Oklahoma law, a Court may disregard the corporate entity if the corporate entity is used, (1) to defeat public convenience, (2) justify wrong, (3) *to perpetrate fraud whether actual or implied,* or (4)

42

to defend crime. _Robertson v. Roy L. Morgan Prod. Co._, 411 F.2d 1041, 1043 (10th Cir. 1969) (emphasis added).

Miller claims in his Motion that Oklahoma courts have not addressed piercing the corporate veil of a limited liability company. Judge Cauthron recently addressed this issue in _TRC Envtl. Corp. v. Quoddy Bay LNG, LLC_, 2011 WL 5429178 (W.D. Okla., 2011) where one of the individual members of a limited liability company sought summary judgment, arguing that because the entity was organized as a limited liability company, the typical veil-piercing rules do not apply and there could not be individual liability. _Id._ at *2. Judge Cauthron, rejected defendant's argument and held:

> Nothing in the Oklahoma Limited Liability Company Act, 18 Okla. Stat. §§ 2000 et seq. suggests that these considerations would not apply to impose liability on the member of an LLC for similar wrongs. Indeed, were the law otherwise, officers and shareholders of an LLC would have greater protection than that existing for other types of corporations. Certainly there is no support in Oklahoma law for such a determination. Accordingly, the Court finds that Oklahoma law permits piercing the corporate veil of an LLC under the same conditions as required for piercing the corporate veil of a corporation.

_Id._ at *2 (emphasis added). Judge Cauthron denied summary judgment, determining, "Thus, questions of fact exist as to whether or not [the limited liability company] was created and/or operated by [the individual member] for a fraudulent purpose." _Id._ at *3.

Similarly, in the case before this Court, Miller's motion for summary judgment should also be denied as fact questions exist as to whether Miller operated his limited liability company for a fraudulent purpose.

**IX.    Miller is liable for bad faith breach of contract because both Miler and Lippard fraudulently, knowingly and intentionally breached Lippard's**

43

**admitted duty to deal fairly and honestly with Plaintiff and the public.**

Each contract carries an implicit and mutual covenant to act towards each other in good faith. *Beshara v. Southern Nat'l Bank*, 928 P.2d 280, 288 (Okla. 1996). Plaintiff's purchase of real property at the auction is treated as a "consumer transaction" under the OCPA. See 15 O.S. 752(2). Miller's agent and auctioneer conceded at his deposition that he owed Plaintiff the duties of honesty, integrity and fair dealing. (AF 27). Thus, a special relationship exists between an auctioneer and the Plaintiff, a member of the consuming public.

Oklahoma courts have recognized that gross negligence or wanton negligence, even in the absence of a fiduciary relationship, can give rise to a tort action for breach of the implied covenant of good faith and fair dealing. Beshara, 928 P.2d at 288-289. Plaintiff claims more than that here. Plaintiff alleges and has submitted evidence that Miller and his agents intentionally *engaged in fraud and deceit* to accomplish the bad faith tortious breach of contract. Plaintiff has submitted sufficient evidence for this Court to submit to the jury the question of whether Miller, acting in concert with his agent auctioneer, tortiously and in bad faith breached the implied covenant of good faith and fair dealing. See *EKE Builders, Inc. v. Quail Bluff Assocs.,* 714 P.2d 604 (Okla.Civ.App.1985).

## X. Plaintiff has tendered sufficient evidence creating triable issues of fact for each of its claims.

Plaintiff has asserted claims against Miller for fraud, breach of contract, rescission, interference with prospective economic advantage, deceptive trade practices, civil conspiracy, and equitable relief. (Doc. 76, Complaint at ¶¶ 54-90 and prayer). Oklahoma

44

law permits recovery for: fraud and constructive fraud, *see* 15 O.S. § 59; see also *Specialty Beverages, LLC v. Pabst Brewing Co.*, 537 F.3d 1165, 1179-1184 (10th Cir. 2008); for breach of contract, *see* Oklahoma Uniform Jury Instructions 3d (Rev. 2009) Instructions No. 23.1-23.56; rescission, *see* 15 O.S. 233; interference with prospective economic advantage, *see Brock v. Thompson*, 1997 OK 127, n. 58, 948 P.2d 279 (Okla. 1997) and see, *Boyle Servs., Inc. v. Dewberry Design Group, Inc.*,24 P.3d 878,880 (Okla.Civ.App. 2001) and *Champagne Metals v. Ken-Mac Metals., Inc.* 458 F.3d 1073 (10th Cir. 2006);  deceptive trade practices, *see* 15 O.S. § 753(8), (11) and (20) and 15 O.S. § 752(13) and (14); civil conspiracy, *see Clark v. Sloan*, 37 P.2d 263 (Okla. 1934); and equitable relief, see *Cleveland Trust co. v. State ex rel. Hunt,* 55 P.2d 594, 596-597 (Okla. 1976), and *Continental Bank v. Burke*, 5 F.3d 545 (Table), 1993 WL 360664 (10th Cir. 1993) (unpublished) .

Plaintiff has set forth sufficient evidence, when viewed in the light most favorable to Plaintiff, to create a genuine jury issue as to whether Miller is liable to Plaintiff on each of Plaintiff's claims.  Miller offers nothing in his Motion that negates the elements of or establishes a defense to Plaintiff's claims. For all of these reasons, Miller's Motion should be denied.

### Relief Requested

For the reasons set forth herein, Plaintiff respectfully requests that this Court overrule Miller, LLC's and Miller's motion for summary judgment.

/s/ Murray E. Abowitz
Murray E. Abowitz, OBA #00117
George W. Dahnke, OBA #2131
Abowitz, Timberlake & Dahnke, P.C.
Post Office Box 1937
Oklahoma City, Oklahoma  73101-1937
Telephone:   (405) 236-4645
Facsimile:   (405) 239-2843
E-mail:       mainmail@abowitzlaw.com
               mea@abowitzlaw.com
               gwd@abowitzlaw.com

**ATTORNEYS FOR PLAINTIFF, ZHN, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of January 2015, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic filing to the following ECF registrants:

Randy J. Long          randy@nwoklaw.com
Clint A. Claypole      clint@nwoklaw.com

**Attorneys for Defendants, Randy Miller, LLC
and Randy L. Miller, Individually**

Timothy S. Harmon      timharmon@holdenlitigation.com
Shawna L. McCalip  ShawnaMccalip@HoldenLitigation.com

**Attorneys for Defendants, Lippard Auctioneers, Inc.
Troy Lippard, Angie Lippard, Brady Lippard,
Jerry Whitney and United Country Real Estate, Inc.
d/b/a United Country**

/s/ Murray E. Abowitz
Murray E. Abowitz